UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

FRANK CACCAVO,

                      Plaintiff,

        -against-

RELIANCE STANDARD LIFE INSURANCE
COMPANY,

                     Defendant.

--------------------------------------------------------X

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: __5/18/21_____ |

19-CV-6025 (KMW)

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

       Plaintiff Frank Caccavo ("Plaintiff" or "Caccavo") has brought an action against Reliance

Standard Life Insurance Company ("Defendant" or "Reliance") pursuant to the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001(3), *et seq*.   Plaintiff

seeks payment of certain insurance benefits in connection with a 2013 automobile accident,

arguing that Reliance improperly began reducing his disability benefits as of late 2016.

Reliance contends that, because Plaintiff had returned to work in some capacity, a reduction in

disability benefits is consistent with the terms of the applicable insurance policy.   Each party

has filed a cross-motion for summary judgment.

       For the reasons set forth below, Plaintiff's motion for summary judgment is DENIED,

and Defendant's motion for summary judgment is GRANTED.

## BACKGROUND

       The facts recited below are drawn from the parties' submissions pursuant to Local Rule

56.1 and documents in the Administrative Record ("A.R.").[1]   These facts are not in dispute.

## I.      The Policy

For more than twenty years, Plaintiff Frank Caccavo worked as an industrial real estate broker for Cushman & Wakefield ("Cushman").   (Pl. 56.1 ¶ 2, ECF No. 26.)   Plaintiff is insured under a long-term disability policy that is sponsored by Cushman.   (Pl. 56.1 ¶ 11 (the "Policy").)

The Policy provides for disability payments in the event that an insured person suffers injury or illness.   As relevant here, the Policy provides for monthly disability benefits in the sum of $24,000 to be paid to Plaintiff if he is considered "Totally Disabled," *i.e.*, unable to perform the material duties of his regular occupation.   (Pl. 56.1 ¶ 12; A.R. 12.)   Disability payments also are due if Plaintiff is considered "Partially Disabled," *i.e.*, "capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis."   (Pl. 56.1 ¶ 17; A.R. 12.)

The Policy also, however, contains provisions for adjusting an individual's benefits in the event that he returns to work in some capacity.   In particular, the Policy contains a "Work Incentive Benefit" provision that reduces the gross monthly benefit by taking into consideration earnings received from the work performed.   (Pl. 56.1 ¶ 18.)   Specifically, "[d]uring the first twelve (12) months of Rehabilitative Employment," Reliance "will not offset earnings from such Rehabilitative Employment" until the Monthly Benefit (before offsets for certain "Other Income Benefits," such as Social Security payments), and the earnings from Rehabilitative Employment "exceed 100% of the Insured's Covered Monthly Earnings."   (A.R. 21, 29.)   "Rehabilitative

---

[1]  Citations to the statements in the parties' Rule 56.1 submissions incorporate the citations therein to the Administrative Record; in some instances, for further clarity, citations to the Administrative Record are expressly noted herein.

Employment," in turn, means "work in any gainful occupation for which the Insured's training, education or experience will reasonably allow.   The work must be approved by a Physician or a licensed or certified rehabilitation specialist approved by [Reliance]."   (A.R. 34.)

## II.   Accident & Acceptance of Liability

On May 13, 2013, Plaintiff was involved in a car accident and suffered leg, arm, and back injuries, as well as a traumatic brain injury.   (Pl. 56.1 ¶¶ 5-6.)   On November 5, 2013, Plaintiff was informed that he was eligible for disability payments pursuant to the Policy.   (A.R. 781.) Reliance thus accepted liability on Plaintiff's claim and commenced monthly benefits payments in November 2013.[2]   (Pl. 56.1 ¶ 22.)

At the same time, Plaintiff received "loyalty payments" from Cushman.   (Pl. 56.1 ¶ 29.) These payments reflected money earned by Plaintiff's team after Plaintiff became disabled, and they were shared with him because Cushman employees wanted to split their commissions with Plaintiff.   (Pl. 56.1 ¶ 30.)   From May 2013 until March 2017, Reliance took the position that Plaintiff's receipt of these payments did not affect his receipt of disability benefits.   (Pl. 56.1 ¶ 31.)

## III.   Plaintiff's Renewal Contract and Desire to Return to Work

The correct amount of Plaintiff's disability benefits became more complicated over the course of 2016.   On January 1, 2006 and January 1, 2011, Plaintiff and Cushman had entered into "employer-broker renewal contracts."   (Pl. 56.1 ¶ 27; Def. Resp. to Pl. 56.1 ¶ 27, ECF No. 38.)   In March 2016, Plaintiff informed Reliance of his desire to be part of another renewal contract with Cushman.   (Pl. 56.1 ¶ 35.)   Plaintiff and Cushman then entered into such an

---

[2]  Certain correspondence in the Administrative Record refers to Matrix Absence Management.   As Reliance explains, Matrix is a third-party administrator that was "involved with the claim early on."   (Def. 56.1 ¶ 14 n.3.)

agreement in 2016, but that contract is not in the Administrative Record.   (*See* Pl. 56.1 ¶ 28; Def. Resp. to Pl. 56.1 ¶ 27.)   Plaintiff's counsel represented to Reliance that, pursuant to the 2016 renewal contract, "the nature of monies received by Mr. Caccavo as shared by his former brokerage team would be no different at that time than they had been paid since his accident in 2013."   (Pl. 56.1 ¶ 37.)

In connection with Plaintiff's expressed desire to return to work, Cushman sought the opinion of Plaintiff's neuropsychologist, Dr. Brett J. Prince.   (Pl. 56.1 ¶ 33.)   In a letter dated June 7, 2016, Dr. Prince stated that he had discussed with Plaintiff the latter's "desire to contribute in a meaningful way in work along with the team members with whom [Plaintiff] previously worked, limited by the nature of his medical condition."   (A.R. 4845; *see* Pl. 56.1 ¶ 32; Def. Resp. to Pl. 56.1 ¶ 32.)   In Dr. Prince's opinion, Plaintiff could "participate in employment as limited by his physical and cognitive abilities, keeping in mind that there is great unpredictability concerning how his body and mind will react and cope with tasks, time management, executive functioning skills and deadlines, or how long he requires to recover from such activity after using his mind to his ability."   (A.R. 4845.)   Dr. Prince further opined that the number of hours Plaintiff would be able to participate would be "minimal," and that any work should be subject to accommodations, such that Plaintiff be able to work "at his own pace," work from home, take breaks as needed, and have others drive him.   (A.R. 4845.)

On September 2, 2016, Andrew Judd, Managing Principal at Cushman, wrote to Plaintiff that, "We look forward to your return to work next week on Tuesday, September 6, 2016." (Def. 56.1 ¶ 20, ECF No. 32.)   Judd's letter noted further that Plaintiff's medical provider had indicated that Plaintiff was "able to return to work with some restrictions that we are able to support."   (Def. 56.1 ¶ 20.)   On December 30, 2016, in an email exchange between Sally Halfhide, Benefits Assistant in Human Resources at Cushman, and Kora Tucci, Managed

Disability Consultant at Reliance, Cushman stated that Caccavo was "back at work with limitations starting 9/6/2016."   (Def. 56.1 ¶ 25.)

### IV.     Reliance's Determination that Plaintiff Had Returned to Work

On March 10, 2017, Reliance informed Plaintiff of its decision to reduce Plaintiff's disability benefits payments, as of the August-September 2016 pay period.   In a letter from Kora Tucci (the "March 2017 Letter"), Reliance determined that Plaintiff "had returned to work in some capacity as of September 6, 2016."   (Def. 56.1 ¶ 30.)   Reliance thus considered Plaintiff to be engaged in Rehabilitative Employment and applied the Work Incentive Benefit provision to payment periods beginning August 10, 2016.   In sum, for the period from August 10, 2016 to January 10, 2017, Reliance determined that Plaintiff had been overpaid $42,708.00 as of January 11, 2017.   (Def. 56.1 ¶ 31; A.R. 660-64.)

In the March 2017 Letter, Reliance stated that it was "making a decision based on the information that is currently available to us."   (A.R. 660.)   Reliance added that it was "still in the process of seeking additional information from [Cushman] regarding [Plaintiff's] return to work efforts," and that it "will still need to comprehensively review any information received with our vocational and/or medical staff."   (A.R. 660.)

### V.     Subsequent Communications and Appeal

Plaintiff disagreed with the determination set forth in the March 2017 Letter.   On May 2, 2017, Plaintiff contested Reliance's calculation that he had received overpayments and provided statements regarding his alleged return to work.   (Def. 56.1 ¶ 32.)   Plaintiff provided, among other documents, statements from him and his spouse stating that he had not returned to work; statements from the Executive Managing Director at Cushman regarding Plaintiff's income; medical records, including assessments from a physician, neurologist, physical therapist, and chiropractor; and a statement from Dr. Prince, who conducted further neurological testing on

March 24, 2017 and stated that, since his initial opinion in June 2016 regarding Plaintiff's desire

to return to work, "it is my understanding that he has not been capable of returning to work in

any capacity."   (Pl. 56.1 ¶ 63; *see* A.R. 4058-4062 (Plaintiff's counsel's summary of enclosed

documentation).)

On May 16, 2017, Reliance acknowledged receipt of this information.   (A.R. 673.)

Reliance stated also that, "[f]or the period January 10, 2017-May 10, 2017, it appears that there is

no offset," because the sum of Plaintiff's earnings and his disability benefits did not exceed his

pre-disability earnings.   (A.R. 673.)

On August 18, 2017, Reliance provided an update regarding the review of Plaintiff's

claims.   (A.R. 682-83.)   Reliance informed Plaintiff that the information recently received was

"completely inconsistent" with earlier responses and information from Cushman, and that "a

more probative investigation into this matter is indicated."   (Def. 56.1 ¶ 42; A.R. 682.)

Reliance requested additional information, including agreements, contracts, and other

correspondence between Cushman and Plaintiff, as well as an array of wage, income, expense,

and reimbursement information from 2013 onwards.   (A.R. 682-83.)

Plaintiff declined to provide the requested information.   (Def. 56.1 ¶¶ 44-45.)   Rather,

on August 29, 2017, Plaintiff informed Reliance that all documentation previously submitted in

support of continuing disability payments and all claim documentation should be considered by

Reliance to be Plaintiff's appeal of the March 2017 Letter.   (Pl. 56.1 ¶ 71.)

**VI.      Reliance's Determination on Appeal**

In light of Plaintiff's August 29, 2017 letter, Reliance began the appeal process.   On

September 12, 2017, in an email exchange among Reliance representatives, the appeal was

assigned to Richard Hellwig.   (Pl. 56.1 ¶ 75.)   In the same email thread, Eileen Brunner,

Appeals Supervisor, told Hellwig that Kora Tucci, who had written the March 2017 Letter, "will

be able to give you the scoop."   (PL. 56.1 ¶ 75.)

Two days later, on September 14, 2017, Hellwig sent Plaintiff a letter requesting a range of information pertaining to his finances and employment.   (Pl. 56.1 ¶ 76.)   That list was substantially equivalent to a list that Reliance had been provided on September 1, 2017 by a forensic accounting firm, Nawrocki Smith, whom Reliance had consulted in connection with Plaintiff's claims.   (Pl. 56.1 ¶ 77; Def. 56.1 ¶¶ 47-48.)   Plaintiff declined to provide the requested information.   (Pl. 56.1 ¶ 82.)

On November 6, 2017, Kari Ortbals, Vice President of Human Resources Benefits at Cushman, wrote a letter to Reliance.   Ortbals stated that "the return to work information for Mr. Frank Caccavo Jr. was inaccurate," that Plaintiff "has not performed work for [Cushman] since his leave initiated," and that "[t]he payments received since his disability were a combination of retention payments, annuity transaction commissions, and loyalty payment from his brokerage team members, none of which payments required any work activity on the part of Mr. Caccavo." (Def. 56.1 ¶ 51.)

On December 7, 2017, in a letter from Hellwig, Reliance upheld its determination as set forth in the March 2017 Letter.   Reliance reaffirmed its decision that Plaintiff had engaged in Rehabilitative Employment as of September 2016, and that, pursuant to the Work Incentive Benefit provision, the income that he received from Cushman was subject to offset from the gross amount of his disability benefits.   (Def. 56.1 ¶ 54; Pl. 56.1 ¶ 84.)

## VII.   This Litigation

On June 28, 2019, Plaintiff filed a Complaint, seeking to recover benefits pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. §1132(a)(1)(B), and reasonable attorneys' fees and costs pursuant to Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1).   (Compl. ¶¶ 84, 86, ECF No. 5.)   Reliance filed an answer on August 22, 2019.   (ECF No. 11.)

The parties initially expressed that they would be open to mediation.   (*See* ECF No. 17.) The parties disagreed, however, about the documentation that would be required for this process, and ultimately canceled any mediation.   (*See* ECF No. 19.)   On June 29, 2020, each party instead moved for summary judgment.   (ECF Nos. 24-28, 30-33.)   On July 13 and July 27, 2020, the parties filed their respective opposition and reply submissions.   (ECF Nos. 34-36, 38-42.)

## LEGAL STANDARDS

### I.   Summary Judgment

Summary judgment is appropriate when the moving party shows that there is "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely disputed when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   In determining whether there is a genuine dispute as to any material fact, a court must "draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party."   *Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998).[3] The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   If the movant can satisfy its

---

[3]  Citing decisions from other circuits, Reliance argues that, in ERISA actions, the non-moving party is not entitled to the "usual inferences in its favor."   (Def. Mem. at 7, ECF No. 33.)   District courts in the Second Circuit, however, routinely recite and apply in tandem both the relevant summary judgment standard and the substantive standards required by ERISA.   *See, e.g.*, *Wedge v. Shawmut Design & Const. Grp. Long Term Disability Ins. Plan*, 23 F. Supp. 3d 320, 332-34 (S.D.N.Y. 2014) (Failla, J.); *McCulloch v. Bd. of Trustees of SEIU Affiliates Officers & Emps. Pension Plan*, 487 F. Supp. 3d 228, 236-37 (S.D.N.Y. 2020) (Gardephe, J.); *see also O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 642 F.3d 110, 117 (2d Cir. 2011) ("[R]egardless of the district court's standard of review of the plan administrator's denial of benefits, a district court may not grant a motion for summary judgment if the record reveals a dispute over an issue of material fact.").

burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

The same standards apply when a court is resolving cross-motions for summary judgment. "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 57 (2d Cir. 2012).

## II.   ERISA

ERISA permits an individual who is denied benefits pursuant to an employee benefit plan to challenge that denial in federal court. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008); *see also* 29 U.S.C. § 1132(a)(1)(B).   When a plan administrator denies benefits, courts review the denial *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).   If, however, the benefit plan confers such discretionary authority on the administrator, courts "will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995)).

In applying the arbitrary and capricious standard, courts "may overturn an administrator's decision to deny ERISA benefits only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Hobson*, 574 F.3d at 83-84.   The scope of review is "narrow." *Id.*   Courts may not substitute their own judgment for that of the insurer "as if [they] were considering the issue of eligibility anew." *Id.*   Evidence is considered "substantial" when a "reasonable mind might accept [such evidence] as adequate to support the conclusion

reached by the decisionmaker." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (internal quotation marks and alterations omitted). This "requires more than a scintilla but less than a preponderance." *Id.*

In addition, in order for a plan administrator to receive the benefit of the "arbitrary and capricious" standard of review, the administrator must comply strictly with the applicable Department of Labor ("DOL") claims procedure regulations. *See Halo v. Yale Health Plan*, 819 F.3d 42, 56-58 (2d Cir. 2016) (holding that administrators must "strictly adhere to the regulation[s] to obtain the more deferential arbitrary and capricious standard of review" and that "substantially comply[ing]" is insufficient). Failure to "strictly adhere" to such regulations will thus result in *de novo* review of a denial of benefits, "unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent *and* harmless." *Id.* at 58 (emphasis in original). Because the party claiming entitlement to deferential review should "prove the predicate that justifies it," the plan bears the burden of proof on this issue. *Id.*

## DISCUSSION

## I.   **Applicable Standard of Review**

The parties do not dispute that the Policy gives Reliance discretion to determine eligibility for benefits and to construe the Policy's terms. (*See* A.R. 17 ("Reliance Standard Life Insurance Company shall serve as the claims review fiduciary with respect to the insurance policy and the Plan. The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits.").) Plaintiff argues, however, that Reliance failed to comply with two specific DOL claims procedure regulations, thus necessitating a *de novo* standard of review. (Pl. Mem. at 15-17, ECF No. 28; Pl. Opp'n at 11-13, ECF No. 36; Pl. Reply at 4-7, ECF No. 41.) Reliance argues that it complied fully with

the relevant DOL regulations and thus is entitled to deference.   (Def. Opp'n at 3-6, ECF No. 40;

*see* Def. Mem. at 7-8, ECF No. 33.)   The Court agrees with Reliance that the "arbitrary and

capricious" standard applies.

First, Plaintiff argues that Reliance did not cite specific plan provisions in the March 2017

Letter, which determined that Plaintiff's benefits payments should be reduced.   (Pl. Mem. at

16.)   In particular, Plaintiff alleges that Reliance "failed to cite the text of the Rehabilitative

Employment clause, nor explain its applicability to Mr. Caccavo's claim, despite that Reliance

claims Mr. Caccavo was working in gainful rehabilitative employment."   (Pl. Mem. at 16.)

The relevant DOL regulation is 29 C.F.R. § 2560.503-1(g)(1)(ii), which sets forth the

"[m]anner and content" for notifications of benefit determinations.   Pursuant to this regulation,

plans must "set forth, in a manner calculated to be understood by the claimant . . . [r]eference to

the specific plan provisions on which the determination is based."   29 C.F.R. §

2560.503-1(g)(1)(ii).

The Court finds that Reliance strictly complied with this regulation.   The March 2017

Letter first states that Reliance had received information from Cushman that "Mr. Caccavo Jr.

has returned to work in some capacity as of September 06, 2016."   (A.R. 660.)   The letter then

quotes the Work Incentive Benefit provision, which expressly references the term "Rehabilitative

Employment."   (*See* A.R. 661.)   The letter then details Reliance's calculations of Plaintiff's

benefits, based on payroll records from September 2016 to January 2017, and explains that

Reliance was "taking into account the Work Incentive Benefit provision, given that the present

information appears to indicate [Plaintiff] is performing his prior position in some capacity."

(A.R. 661-62.)

Plaintiff is correct that the letter does not separately *quote* the text of the "Rehabilitative

Employment" definition, which appears five pages later in the Policy under the "Rehabilitation

Benefit" provision.   (*See* A.R. 29, 34.)   The DOL regulation, however, requires that Reliance "reference" the specific plan provisions on which the determination is based "in a manner calculated to be understood by the claimant."   29 C.F.R. § 2560.503-1(g)(1)(ii).   The March 2017 Letter, which explains Reliance's understanding that Plaintiff had returned to work in some capacity and provides a detailed calculation pursuant to the Work Incentive Benefit provision—which includes the term "Rehabilitative Employment"—satisfies this requirement.

The two decisions cited by Plaintiff in support of his argument do not require a different result.   In *Babino v. Gesauldi*, the Second Circuit affirmed the district court's decision to apply a *de novo* standard when the defendants "did not cite to *any* plan provisions" in support of their decision to subtract hours that the plaintiff had worked from his Pension and Annuity Funds. 278 F. Supp. 3d 562, 585 (E.D.N.Y. 2017) (emphasis in original), *aff'd*, 744 F. App'x 30 (2d Cir. 2018); *see also McCutcheon v. Colgate-Palmolive Co.*, 2020 WL 3893303, at *8 (S.D.N.Y. July 10, 2020) (Schofield, J.) (collecting cases and finding the regulation violated when a denial letter revealed inconsistencies and omissions, including a failure to explain why a certain provision was used to calculate an annuity benefit).   As discussed, Reliance's letter did cite to provisions of the Policy and explained that its determination rested on evidence that Plaintiff had returned to work in some capacity.   Plaintiff also cites *Spears v. Liberty Life Assurance Co. of Bos.*, 2019 WL 4766253 (D. Conn. Sept. 30, 2019).   That decision, however, relates to numerous other DOL regulations that are not at issue here, and it does not address 29 C.F.R. § 2560.503-1(g)(1)(ii).   Plaintiff's argument regarding this regulation thus fails.

Second, Plaintiff argues that, during the appeal that was conducted by Richard Hellwig, Quality Review Unit Supervisor, Reliance "intentionally and blatantly deferred to the initial claim decision."   (Pl. Mem. at 16-17; *see also* Pl. Opp'n at 12-13.)   As relevant here, the ERISA regulations require that, during appeals of adverse benefit determinations, a claimant is

entitled to a "full and fair review of the claim and the adverse benefit determination."   29 C.F.R.

§ 2560.503-1(h)(1).   Specifically, a group health plan must "[p]rovide for a review that does not

afford deference to the initial adverse benefit determination and that is conducted by an

appropriate named fiduciary of the plan who is neither the individual who made the adverse

benefit determination that is the subject of the appeal, nor the subordinate of such individual."

*Id.* § 2560.503-1(h)(3)(ii).

Here, too, Reliance has met its burden to demonstrate strict compliance with ERISA

regulations.   In the March 2017 Letter, Reliance advised Plaintiff that he was entitled to request

a review of that decision.   (A.R. 663.)   Reliance further stated that "[a]ny such review will be

conducted by an individual who is neither the individual who made the underlying determination

that is the subject of the review, nor the subordinate of such individual."   (A.R. 663.)

On December 7, 2017, after further correspondence between the parties, Richard Hellwig

wrote a detailed, eight-page letter summarizing that review (the "Appeal Letter").   (A.R.

698-705.)   The Appeal Letter first confirmed that "Mr. Caccavo is entitled to an independent

review of his claim," that the "claim file was referred to the Quality Review Unit to conduct such

a review," and that the review was "conducted separately from the individual(s) who made any

original determination."   (A.R. 698.)   The Appeal Letter then explained that the Quality

Review Unit had "review[ed] the information on file," determined that Plaintiff "engaged in

Rehabilitative Employment beginning September 2016," and that "monthly benefits he has

received since that time are subject to reduction of earnings received from Rehabilitative

Employment in accordance with the Work Incentive Benefit and Rehabilitation Benefit

provisions of the Policy."   (A.R. 705.)

There is no indication that, in reaching this determination, deference was given to the

initial decision.   In the Appeal Letter, Hellwig observed that there was evidence supporting the

conclusion that Plaintiff had returned to work in September 2016, including that Plaintiff and Cushman had entered into a renewal contract.   (A.R. 704.)   Hellwig further stated that, although Reliance had sought to obtain a copy of that contract, Plaintiff refused to provide it. (A.R. 704.)   Hellwig noted that "[t]he claim file is replete with conflicting information from numerous individuals at Cushman & Wakefield, as well as Mr. Caccavo," but that Plaintiff had refused to provide the requested information that may have assisted in clarifying those inconsistencies.   (A.R. 703-04.)   Based on a review of the available information, Hellwig concluded that "the original determination was appropriate."   (A.R. 705.)

In arguing that Reliance exercised improper deference, Plaintiff refers to a sequence of events in mid-September 2017.   Plaintiff identifies a September 12, 2017 email in which the Appeals Supervisor of the Quality Review Unit, Eileen Brunner, informed Hellwig that Kora Tucci—the individual who had written the March 2017 Letter and rendered the initial determination on Plaintiff's claim—"will be able to give you the scoop."   (A.R. 5991.)   Two days later, on September 14, 2017, Hellwig wrote a letter to Plaintiff, requesting a set of documents including tax returns and employment agreements.   (A.R. 693-94.)   Tucci had requested a similar (but not identical) set of documents in a letter dated August 18, 2017, in an attempt to conduct a "more probative investigation."   (A.R. 682-83.)

According to Plaintiff, the prompt turnaround time between the September 12, 2017 email correspondence and Hellwig's September 14, 2017 letter requesting documents raises suspicion. As Plaintiff puts it: "That the appeals representative two days later generated virtually the same letter the claim representative had sent to Mr. Caccavo's counsel seeking documents smacks of inappropriate influence and sharing of information . . . and removes independence from the appeal consideration."   (Pl. Mem. at 17.)   Plaintiff asserts, without evidence, that the statement that Tucci would be able to give Hellwig the "scoop" represents "just the tip of the iceberg

concerning influence by the claims department in the appeal consideration."   (Pl. Mem. at 17.)

Plaintiff's argument is unpersuasive.   As Reliance points out, the list of documents requested by Hellwig on September 14, 2017 does not copy the list generated by Tucci one month prior.   (*See* Def. Opp'n at 6.)   Rather, Hellwig's request mirrors a list of documents identified on September 1, 2017, by Nawrocki Smith, an *independent* accounting firm that Reliance retained for purposes of assisting Reliance in calculating Plaintiff's benefits and earnings.[4]   (*See* A.R. 4984.)   In addition, apart from the September 12, 2017 email, there is no evidence that any communication in fact took place between Hellwig and Tucci—much less any communication that would run afoul of ERISA regulations.

The Court recognizes that strict compliance is required in order for Reliance to maintain the benefit of a deferential standard of review.   *See Halo*, 819 F.3d at 56-58.   In light of the above, the Court finds that Reliance has met its burden to satisfy this standard.   Accordingly, the Court will review Reliance's adverse benefit determination under the "arbitrary and capricious" standard.

## II.   The Parties' Cross-Motions for Summary Judgment

The Court has considered each of the parties' cross-motions on its own merits.   Because there is substantial overlap in the parties' arguments, however, and because the Court finds no genuine issues of material fact, the motions will be discussed in tandem.[5]

---

[4]  Plaintiff suggests, in a footnote, that "Nawrocki Smith is a known biased third-party," citing as evidence that the firm has been named as an alleged co-conspirator, alongside insurance companies, in two civil RICO complaints.   One of these cases has since been dismissed, *see* ECF No. 24, *Farber v. Northwestern Mutual Life Ins. Co.*, No. 19-cv-6467 (E.D.N.Y. June 18, 2020), and Plaintiff cites to no order or opinion in the second to support his assertion.   *See Myers v. Provident Life and Accident Ins. Co., et al.*, No. 19-cv-724 (M.D. Fla.).

[5]  Any arguments not addressed below have been considered by the Court on the merits and rejected.

### A.      Reliance's Conflict of Interest

As an initial matter, Plaintiff argues that the Court should "dial back" the deference given to Reliance because of a conflict of interest.    (Pl. Mem. at 18-20.)    When an ERISA administrator both reviews claims for benefits and bears the financial liability for such claims, it has an inherent, structural conflict of interest.    *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).    Reliance concedes that it operates under such a conflict.    (*See* Def. Opp'n at 10.)

The existence of a conflict does not change the applicable standard of review.    Rather, courts must take the conflict into account and weigh it as a factor in determining whether the administrator abused its discretion in denying benefits.    *McCauley v. First Unum Life Ins.* Co., 551 F.3d 126, 133 (2d Cir. 2008).    The weight that is accorded "varies in direct proportion to the likelihood that the conflict affected the benefits decision."    *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 485 n.13 (2d Cir. 2013) (quoting *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 139 (2d Cir. 2010)).    Evidence that a conflict affected a benefits determination may be categorical, including whether an administrator has "a history of biased claims administration," or case-specific, such as when an administrator acts unreasonably or deceptively. *Durakovic*, 609 F.3d at 140.    No weight, however, is given to a conflict "in the absence of any evidence that the conflict actually affected the administrator's decision."    *Id.* (citing *Hobson*, 574 F.3d at 83).

Plaintiff offers categorical and case-specific reasons to justify giving significant weight to Reliance's conflict.    Plaintiff first argues that Reliance has a history of biased claims administration.    Plaintiff relies on a decision from the Southern District of Mississippi, in which the court *sua sponte* surveyed 100 decisions and stated that, on balance, "the judicial record establishes an unmitigated pattern of arbitrary and wrongful behavior by Reliance."    (Pl. Mem. at 21 (citing *Nichols v. Reliance Standard Life Ins. Co.*, 2018 WL 3213618, at *6-9 (S.D. Miss.

16

June 29, 2018), *rev'd*, 924 F.3d 802 (5th Cir. 2019)).[6])   In addition, Plaintiff argues that the Administrative Record "reeks of self-interest" and of attempts by Reliance to avoid liability. (Pl. Mem. at 22.)   Plaintiff asserts that Reliance, without evidence, first considered limiting benefits payments pursuant to an alcohol use limitation; unsuccessfully tried to invoke a limitation based on the "mental and nervous clause" of the Policy; and informed Plaintiff that it would offset his monthly benefits on the basis of "loyalty payments" shared with Plaintiff by his former team members.   (Pl. Mem. at 22-23.)

The survey of decisions conducted by the district court in *Nichols* raises some concern about Reliance's past practices in other cases.   In reversing the district court's decision, however, the Fifth Circuit expressed skepticism about the analysis, observing that "to portray an unmitigated pattern of arbitrary and wrongful behavior by Reliance, the court ignored the forty cases upholding Reliance's decisions," and further stating that the district court "presented that alleged pattern without input from either party."   *Nichols v. Reliance Standard Life Ins. Co.*, 924 F.3d at 814 (internal quotation marks omitted).   In addition, many of the decisions discussed by the district court in *Nichols* focused on whether a claimant could be considered disabled under the relevant policy—an issue that is somewhat distinct from the issues in this case concerning rehabilitative employment.   *See Nichols*, 2018 WL 3213618, at *6-9.   The Court thus is not persuaded that Reliance has a history of biased claims administration.

Furthermore, Plaintiff has not demonstrated that Reliance's conflict "actually affected the administrator's decision."   *Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 218 (2d Cir. 2015)

---

[6]  As Reliance points out, the Fifth Circuit reversed the district court's decision because its "extensive *sua sponte* review eschewed our repeated holdings that a structural conflict is not a significant factor where the claimant offers no evidence that the conflict impacted the administrator's decision."   *Nichols v. Reliance Standard Life Ins. Co.*, 924 F.3d 802, 814 (5th Cir.), *cert. denied,* 140 S. Ct. 186 (2019).

(quoting *Durakovic*, 609 F.3d at 140).   As the Second Circuit has explained, "a smoking gun is not always required; under certain circumstances, an irrational decision or a one-sided decisionmaking process can alone constitute sufficient evidence that the administrator's conflict of interest actually affected the challenged decision."   *Id.*   Here, however, notwithstanding Plaintiff's characterization of Reliance's actions as an unrelenting effort to strip Plaintiff of benefits, the Administrative Record demonstrates that, in each instance Plaintiff claims is improper, Reliance evaluated information available to it, considered the terms of the Policy, and at times revised their assessments in light of new information received.

First, with respect to the alcohol use limitation, the record shows that Reliance "[i]nitially applied the 24 month Alcohol/Substance Abuse Limitation," but that "[s]ubsequent medical review ruled this out, so the duration was updated."   (A.R. 8108; *see also* A.R. 9136.)   Second, with respect to the "mental and nervous clause," Reliance communicated to Plaintiff that, "[b]ased on the current medical information it appears that a portion of [Plaintiff's] disability *may* be caused by a Mental or Nervous disorder," and that the relevant Policy provision "*may* apply to [Plaintiff's] claim."   (A.R. 596-97 (emphasis added).)   Plaintiff does not argue that Reliance actually applied that provision to limit benefit payments.   In fact, the record shows that Plaintiff wrote to Reliance to express his disagreement, and the matter appears to have ended there.   (*See* A.R. 3050-52.)   Third, with respect to "loyalty payments," the record demonstrates that some Reliance representatives considered that such payments would require an offset to Plaintiff's benefits.   (*See* A.R. 8579.)   On further examination, however, Alexander Peaker, Supervisor of Integrated Disability at Reliance, expressed that "[i]f these commissions were earned prior to [Plaintiff's] disability but not paid until after his disability I don't think it would not be included in his covered monthly earnings calculations and it would not be considered as an offset as well."   (A.R. 9199-9200.)   As a result, Plaintiff's benefits were not offset on the basis

of loyalty payments.   (*See* A.R. 660-64, 10,413.)

Finally, with respect to the March 2017 Letter and the Appeal Letter, Reliance's reasoning was not so "one-sided" as to constitute evidence that the conflict influenced its decisionmaking.   *See Durakovic*, 609 F.3d at 140-41 (finding that pension, health, and benefits funds' reasoning was "one-sided" because the funds relied on a report by their own vocational expert and "summarily dismissed" a "vastly more detailed and particularized" report from the claimant's vocational expert).   Rather, as explained further below, Reliance took into account new evidence that Plaintiff offered after receipt of the March 2017 Letter, determined that this information conflicted with what Reliance had previously received, sought further documentation, and was hindered in that further inquiry.   (*See* A.R. 702-04.)

These facts thus distinguish the instant case from *McCauley*, on which Plaintiff relies. (*See* Pl. Mem. at 22.)   In that decision, the Second Circuit concluded that the insurer operated under a conflict of interest and had a "well-documented history of abusive claims processing." *McCauley*, 551 F.3d at 138.   The court also concluded that the insurer had relied on one medical report to the detriment of a more detailed, contrary report "without further investigation"; deceived the claimant by stating that a particular reviewer was a medical doctor when the individual was in fact a nurse; and mischaracterized its rationale for denying benefits on appeal. *Id.*   The court thus found that, "collectively," these factors supported the conclusion that the administrator "was in fact affected by its conflict of interest."   *Id.*

In sum, the Court finds no evidence that Reliance's conflict *actually* affected its denial of benefits.   Consequently, Reliance's structural conflict of interest will not be given any weight in the Court's review.   *See Durakovic*, 609 F.3d at 140 (citing *Hobson*, 574 F.3d at 83).

### B.      Substantial Evidence Regarding Reliance's Benefits Determination

In applying the arbitrary and capricious standard, courts may overturn a benefits

determination only if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Hobson*, 574 F.3d at 83-84.   Evidence is considered "substantial" when a "reasonable mind might accept [such evidence] as adequate to support the conclusion reached by the decisionmaker." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (internal quotation marks and alterations omitted).   This "requires more than a scintilla but less than a preponderance." *Id.*

Plaintiff argues that Reliance's decision was not based on substantial evidence. According to Plaintiff, the record contains overwhelming evidence that Plaintiff could not perform any work, and that "[t]here is also no evidence on this record to refute that Mr. Caccavo has not performed work since his accident in May 2013." (Pl. Mem. at 24; *see also* Pl. Opp'n at 15-18.)   To the extent that Cushman reported that Plaintiff had returned to work in September 2016, Plaintiff asserts that the company simply made a mistake, and that Reliance "refused to accept correction of the error." (Pl. Mem. at 24-25.)

The Court finds, however, that Reliance's decision is supported by sufficient evidence such that it cannot be considered arbitrary and capricious.   Specifically, in March 2016, Plaintiff informed Reliance that he had been approached by Cushman "to remain part of the team in an upcoming renewal contract." (A.R. 3422.)   In June 2016, Plaintiff informed his neuropsychologist that he desired to return to work in some capacity, and Dr. Prince opined that, with limitations, Plaintiff may be able to do so in a "minimal" way. (A.R. 3962.)   On September 2, 2016, Andrew Judd, a Managing Principal at Cushman, confirmed that the company would be able to support the restrictions recommended by Dr. Prince. (A.R. 3958.) On December 30, 2016, Sally Halfhide, a Benefits Assistant for Cushman, stated by email that "Mr. Caccavo is back at work with limitations starting 9/6/2016." (A.R. 3791.)   In January 2017, when Reliance inquired whether Plaintiff had returned to work in his prior job or was

performing a new role, Vicky Fajardo, Manager of Human Resources at Cushman, provided a

job description role for a "Broker or Salesperson" and explained that "[t]his is the closest to his

role."   (A.R. 3848-50.)

Plaintiff points out that there are numerous pieces of evidence to the contrary.   In May

2017, for example, after Reliance had begun to offset Plaintiff's benefits, Plaintiff provided

Reliance with additional information, including statements from Plaintiff himself, Plaintiff's wife,

Dr. Prince, and employees at Cushman.   (*See* A.R. 4058-62.)   Some of these documents

contradict prior information supporting the conclusion that Plaintiff had returned to work.   Dr.

Prince, for example, stated that "it is my understanding that [Plaintiff] has not been capable of

returning to work in any capacity," notwithstanding the June 2016 opinion that Plaintiff may be

able to make minimal contributions.   (A.R. 4069.)   Other supplemental evidence, however, is

more equivocal.   A statement from Marcus Petrella, Executive Managing Director at Cushman,

states that Plaintiff "was not working *in the traditional sense*," and that Cushman "still wanted

him to be part of the team and to be monetarily rewarded."   (A.R. 4064 (emphasis added).)

Moreover, when Reliance attempted to gather further information about the nature of the

latest contract between Plaintiff and Cushman, in addition to other financial and

employment-related documentation, Plaintiff declined to provide these documents, instead

explaining that the initial return-to-work information from Cushman "was incorrect and has since

been corrected," and asserting that Reliance's requests for further documentation were "irrelevant

and immaterial."   (*See* A.R. 682-85; 693-94; 4981-82, 5002-05.[7])

Contrary to Plaintiff's assertions, such documentation may indeed be relevant.   As Reliance explained, it sought further documentation in order to understand both the nature of Plaintiff's earnings and inconsistencies in the record regarding Plaintiff's return to work.   (*See, e.g.*, A.R. 693-94; 702-04.)   For example, payroll records that were provided beginning with the month of August 2016 revealed that Plaintiff continued to receive earnings from Cushman, including commissions, bonuses, deferred compensation payments, and a "Loan Payment – Retention" payment.   (*See* A.R. 701.)   The nature of such payments in connection with any work performed, particularly in light of a renewed contract between Cushman and Plaintiff, and how such payments may compare to those received in the past, is central to the instant dispute.[8]

In these circumstances, the Court cannot conclude that the evidence cited by Plaintiff is so overwhelming that it warrants overturning Reliance's decision as unreasonable.   *See Roganti*, 786 F.3d at 212 ("[I]n cases where the evidence conflicts, an administrator's conclusion drawn from that evidence that a claim should be denied will be upheld unless the evidence points so decidedly in the claimant's favor that it would be unreasonable to deny the claim on the basis of the evidence cited by the administrator."); *see also Hafford v. Aetna Life Ins. Co.*, 2017 WL

_____

[7]  Reliance argues that Plaintiff's refusal to provide certain documentation bars his claim entirely.   (Def. Mem. at 8-13.)   The decisions cited by Reliance, however, do not support such a stark result.   *Camarda*, for example, concerns a claimant's refusal to provide information to which the insurer was "clearly entitled . . . under the terms of the Plan."   *Camarda v. Pan Am. World Airways, Inc.*, 162 F.3d 1147 (2d Cir. 1998) (summary order).   *Hobson* concerns the distinctions between objective and subjective *medical* evidence, as opposed to the type of evidence that may relate to a claimant's work-related activities or the nature of their income.   *See Hobson*, 574 F.3d at 88; *see also Schussheim v. First Unum Life Ins. Co.*, 80 F. Supp. 3d 360, 378 (E.D.N.Y. 2015) (finding that a years-long failure to cooperate violated a policy provision to provide "proof of continued . . . disability").   Plaintiff's actions may have hindered the development of a fuller administrative record, but they do not support a wholesale bar to bringing the instant claims.

[8]  Plaintiff argues that, based on a confidentiality provision in the renewal contract between Cushman and Plaintiff, neither is authorized to provide the contract to Reliance.   (*See* Pl. Mem. at 6.)   As Defendant points out, however, previous contracts containing confidentiality provisions were provided for purposes of assisting with benefits determinations.   (*See* Def. Opp'n at 12.)

4083580, at *8 (S.D.N.Y. Sept. 13, 2017) (Caproni, J.) (holding that insurer's decision "was not unreasonable, even if it was possible to reach a different conclusion"). Accordingly, the Court will uphold Reliance's benefits determination.[9]

### C. Whether Reliance's Determination Is Erroneous as a Matter of Law

Finally, Plaintiff argues that Reliance's determination should be overturned because it is "erroneous as a matter of law." (Pl. Mem. at 31-35.) When an administrator "imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain terms," the administrator's actions may be arbitrary and capricious. *McCauley*, 551 F.3d at 132-33. Plaintiff's arguments are unavailing.

First, Plaintiff argues that there is no basis for Reliance to have requested historical financial and other employment-related documentation. Although Reliance concedes that the Policy does not authorize it to request this specific information, it is not inconsistent with the terms of Policy to do so, nor does it impose a "standard" not required by the Policy. *See McCauley*, 551 F.3d at 132-33. Plaintiff also speculates that Reliance, in requesting this information, aims to revisit *prior* benefits determinations, to apply the "Other Income Benefits"

---

[9] Plaintiff makes two additional arguments that should briefly be addressed. First, Plaintiff argues that the Policy requires that proposed work that is to be considered Rehabilitative Employment must be approved by a physician or a certified rehabilitation specialist approved by Reliance. (Pl. Mem. at 27-28.) Plaintiff asserts that Jody Barach, Manager of Reliance Vocational Services, performed only a cursory analysis, without interviewing Plaintiff, and did so only after Reliance had issued its adverse benefits determination. (Pl. Mem. at 27-28.) This argument misses the mark. Plaintiff's neuropsychologist, Dr. Prince, had assessed Plaintiff and approved a return to work in June 2016, albeit with limitations and in a minimal capacity. (*See* A.R. 3962.) Ms. Barach's report is not, as Plaintiff characterizes it, a post-hoc attempt at "a paper justification for [Reliance's] biased decision." (Pl. Mem. at 29.)

Second, Plaintiff argues that Reliance may not rely on the "Other Income Benefits" provision in order to reduce Plaintiff's benefits on the basis of "loyalty payments." (Pl. Mem. at 30-31.) This argument mischaracterizes Reliance's actions. Reliance did not rely on the "Other Income Benefits" provision. (*See* A.R. 660-664, 698-705.) Rather, based on the conclusion that Plaintiff had returned to work, at least in some capacity, Reliance recalculated Plaintiff's benefits pursuant to the "Work Incentive Benefit" provision. (*See* A.R. 660-664.)

provision, and "to retroactively claw back Mr. Caccavo's benefits dating back to 2013."   (Pl. Mem. at 32-33.)   There is no indication that Reliance seeks to take such action.   Instead, as discussed above, Reliance has reasonably explained that, based on substantial evidence that Plaintiff would be returning to work in at least some capacity and had entered into a renewal contract, Reliance sought further documentation to understand the nature of Plaintiff's earnings and inconsistencies in the record regarding Plaintiff's return to work.   (*See, e.g.*, A.R. 693-94; 702-04.)   Those inquiries relate to the Work Incentive Benefit provision, not to the Policy's terms regarding Other Income Benefits.

Second, Plaintiff argues that the Policy requires the payment of full benefits because Plaintiff is considered "Partially Disabled."   (Pl. Mem. at 34-35.)   But, as Reliance points out, an individual may be considered "Partially Disabled" but *also* engaged in Rehabilitative Employment.   (Def. Opp'n at 11.)   Rehabilitative Employment expressly includes "work in any gainful occupation for which the Insured's training, education or experience will reasonably allow," including "work performed while Partially Disabled."   (A.R. 34.)   There is no inconsistency in Reliance conceding that Plaintiff is Partially Disabled pursuant to the Policy, while also concluding that Plaintiff was approved for, and engaged in, Rehabilitative Employment.

### D.    Attorney's Fees

In addition to seeking recovery of benefits, Plaintiff also seeks reasonable attorney's fees. (Compl. ¶ 86.)   A party may be eligible for attorney's fees in ERISA cases if it has achieved "some degree of success on the merits."   *Scarangella v. Grp. Health, Inc.*, 731 F.3d 146, 152 (2d Cir. 2013) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 254 (2010)). Because the Court is denying Plaintiff's motion for summary judgment and granting summary judgment in favor of Reliance, that standard is not satisfied.

## CONCLUSION

For the reasons set forth above, it is hereby ORDERED that:

1.  Defendant's motion for summary judgment is GRANTED.

2.  Plaintiff's motion for summary judgment is DENIED.   Plaintiff's request for oral argument

    also is DENIED.

3.  The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 24 and 30,

    to enter judgment in favor of Defendant, and to close this case.


    SO ORDERED.

Dated: New York, New York
      May 18, 2021                                 _/s/ Kimba M. Wood_
                                                 KIMBA M. WOOD
                                           United States District Judge